# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | ‖ | No. 23-CR-1009-CJW-MAR |
| vs. | ‖ | **ORDER** |
| CARI LYNN BEDTKA, | ‖ | |
| Defendant. | ‖ | |

_____

## *I.      INTRODUCTION*

This matter is before the Court on defendant's Motion for Revocation of Order of Detention, filed on May 2, 2023. (Doc. 20). The government filed a timely resistance. (Doc. 21). For the following reasons, the Court **denies** defendant's motion.

## *II.      RELEVANT BACKGROUND*

On April 5, 2023, a grand jury returned an indictment charging defendant with two counts of distribution of a controlled substance in violation of Title 21, United States Code, Section 841(a)(1); one count of attempted distribution of a controlled substance in violation of Title 21, United States Code, Section 841(a)(1), and; two counts of use of a communication facility to commit a drug offense in violation of Title 21, United States Code, Section 843(b). (Doc. 3).

On April 11, 2023, defendant was arrested on this charge. (Doc. 7). On April 13, 2023, defendant appeared for her initial appearance and arraignment before United States Magistrate Judge Mark A. Roberts in the Northern District of Iowa. (Doc. 9). The government made an oral motion to detain defendant pending trial. (Doc. 10). Judge Roberts ordered defendant temporarily detained pending a detention hearing. (Doc. 11).

1

On April 18, 2023, Judge Roberts held defendant's detention hearing. (Doc. 16). At the hearing, the government offered and Judge Roberts admitted exhibits 1 through 3, Facebook Messenger business record reports relating to alleged drug transactions, to which defendant did not object. (Doc. 19, at 3 (discussing exhibits filed at Doc. 15, 15-1, and 15-2)). The government also relied on the pretrial services report authored by the probation office (Doc. 14), of which Judge Roberts took formal notice (Doc. 19, at 2-3). The pretrial services report recommended defendant's release subject to conditions. (Doc. 14, at 7-8). The government called Investigator Chad Leitzen. Defendant presented no evidence, but proffered two clarifications as to the pretrial services report. (Doc. 19, at 30-31).

At the conclusion of the hearing, Judge Roberts found the government met its burden as to danger to any other person and/or the community;[1] accordingly, Judge Roberts ordered defendant detained. (Docs. 16 & 17).

Defendant now appeals Judge Roberts' detention order, arguing her release is appropriate for three reasons. (Doc. 20). First, defendant asserts she rebutted the presumption of detention because the probation office recommended her release, subject to recommended conditions. (Doc. 20-1, at 4-5). Second, defendant asserts the government did not meet its burden of proof as to the danger she poses. (*Id.*, at 5-7). Defendant begins by arguing that the alleged conduct did not involve violence or firearms, and involved distribution or attempted distribution of only small amounts of controlled substances, and the related use of communications facilities related directly to two of those distributions. (*Id.*, at 5-6). Defendant then asserts that, though Judge Roberts was concerned about her "somewhat cynical approach to the drug trade" based on her comments about people not being able to handle their heroin and the possibility that she may have left a person "in distress" to go sell drugs, Judge Roberts ignored the

---

[1] The government did not argue that defendant poses a risk of flight. (Doc. 19, at 35).

fact that the person's girlfriend was also present and it is unclear whether the person needed Narcan. (*Id.*). Finally, defendant argues that Judge Roberts' concerns about the status of defendant's drug treatment, based in part on evidence that she was selling methadone and attempting to cheat drug tests, were misplaced because defendant's attendance at the methadone clinic was verified and it is unlikely that defendant could successfully cheat drug testing on federal pretrial release. (*Id.*, at 6).

The government resists defendant's appeal. (Doc. 21). First, the government asserts that defendant did not rebut the presumption of detention. (*Id.*, at 11-12). The government then argues that even if defendant did rebut the presumption, on balance, the Section 3142(g) factors weigh heavily in favor of detention. (*Id.*, at 13-15).

### III.     STANDARD OF REVIEW

Under the Bail Reform Act, Title 18, United States Code, Section 3142(e)(1), a court must detain a defendant "[i]f, after a hearing . . ., the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required[.]" Title 18, United States Code Section 3145(a) allows a defendant detained under this section to move for the revocation of a detention order:

> If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court,--
> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release;
> . . .
> The motion shall be determined promptly.

18 U.S.C. § 3145(b). The Court reviews a Section 3145(a) motion de novo. *See United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc). Whether a defendant should be detained turns on two questions: (1) whether defendant poses a risk of flight, and (2) whether defendant poses a danger to the community. To resolve these questions,

3

a court considers (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). To warrant the detention of the defendant, the government must demonstrate "by clear and convincing evidence that no release condition or set of conditions will reasonably assure the safety of the community [or] by a preponderance of the evidence that no condition or set of conditions . . . will reasonably assure defendant's appearance" at trial. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). "[T]he lack of reasonable assurance of *either* defendant's appearance or the safety of others or the community is sufficient; both are not required." *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985).

For the majority of defendants, the Court's analysis under Section 3142 proceeds with a presumption favoring release. *Orta*, 760 F.2d at 890–91. Accordingly, "pretrial detention should be the exception rather than the rule in federal criminal cases." *United States v. Leyba*, 104 F.Supp.2d 1182, 1183 (S.D. Iowa 2000). Some exceptions to the presumption in favor of release are enumerated in Title 18, United States Code, Section 3142(e)(3). This Section establishes a rebuttable presumption that detention is necessary "if the judicial officer finds that there is probable cause to believe that the [defendant] committed," *inter alia*, "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C § 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. § 651 et seq.), or chapter 705 of title 46." 18 U.S.C § 3142(e)(3)(A).

Once the judicial officer establishes the presumption of detention, "defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight." *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (internal citations and quotations omitted). "Once a defendant has met her burden of production relating

4

to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the [court]." *Id.*

## IV.     ANALYSIS

For the following reasons, the Court finds detention is appropriate and denies defendant's motion. Based on the evidence presented at the detention hearing, the government carried its burden as to the danger defendant poses.

### A.     *Presumption Favoring Detention*

This case triggers the presumption of detention enumerated in Section 3142(e)(3)(A) (providing a presumption of detention for offenses for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)). Here, the Court finds, the government showed evidence supporting probable cause that defendant committed a qualifying offense. *See, e.g.*, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (generally requiring a maximum 20-year term of imprisonment); (Doc. 3) (charging defendant with this offense). As such, defendant bears a limited burden of production to rebut that presumption by coming forward with evidence she does not pose a danger to the community. *Abad*, 350 F.3d at 797.

Reviewing the detention hearing transcript, it is unclear whether Judge Roberts ultimately concluded that defendant rebutted the presumption of detention or not. (*Compare* Doc. 19, at 39 ("I generally agree with [defense counsel] that when the probation office recommends release that that should be a basis for concluding that you have rebutted the presumption."), *with id.*, at 40 ("In this case I think a lot of things that came to light in the course of the hearing make me doubt whether you rebutted that presumption.")). But because Judge Roberts engaged in a detailed analysis of the evidence presented (*Id.*, at 40-43), the Court interprets that Judge Roberts ultimately concluded that defendant rebutted the presumption.

For the following reasons, the Court finds, defendant rebuts the presumption of detention. At the detention hearing, the evidence showed defendant is a lifelong resident

of Dubuque, Iowa, has family support, and residential options if she is released. The evidence also showed defendant has no history of engaging in violent criminal conduct and the majority of her prior convictions are relatively minor controlled substance violations. Thus, defendant has provided sufficient evidence to rebut the presumption that detention is necessary here.[2]

Although defendant has met her burden of production, the Court must still consider the presumption's existence as a factor in its ultimate analysis of whether detention is appropriate. *See Abad*, 350 F.3d at 797; 18 U.S.C. § 3142(g).

### B. Government's Burden

For the following reasons, the Court finds the government meets its burden of showing by clear and convincing evidence that defendant poses a danger to the community.

### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense are very serious and weigh in favor of detention. *See* 18 U.S.C. § 3142(g)(1).

First, defendant is alleged to have distributed methamphetamine on or about September 1, 2020, in a controlled purchase. (Doc. 19, at 6-8).

Defendant is also alleged to have distributed fentanyl on or about July 7, 2021, and to have used a communication facility in doing so.[3] (*Id.*, at 8-21). Days before,

---

[2] Accordingly, the Court need not reach defendant's argument that a defendant always rebuts the presumption when the probation office recommends release. A recommendation in a bond report does not rebut anything. The facts contained in the bond report if stipulated or proven as true may rebut a presumption, but a recommendation is not a fact and cannot rebut a presumption of detention. A presumption must be rebutted by facts, not opinion. But the government is incorrect that whether a presumption is rebutted requires a weighing of all the evidence. (*See* Doc. 21, at 11-12). Whether a defendant rebuts the presumption can be based on a single fact; it is not the balancing of all the evidence. That is a test of persuasion, not production.

[3] The indictment alleges defendant sold fentanyl on this date. (Doc. 3). At times in the hearing and the parties' briefing, this sale is referred to as a sale of heroin. Such references, however,

defendant had been discussing selling heroin with a potential purchaser. (Docs. 15, at 1-2; 19, at 10-11). The sale was waylaid because defendant's original supplier stopped distributing his current supply because three people overdosed on it. (Docs. 15, at 2; 19, at 12). Defendant told the purchaser "Its stupid cuz I did sum and didn't think it was horribly strong. People just do too much and can't handle their shit n ruin it for others[.]" (Docs. 15, at 3; 19, at 12). Defendant later contacted the purchaser again, stating that she could probably find heroin from another supplier, and sold that heroin to the purchaser. (Docs. 15, at 3; 19, at 13). The next day, the purchaser, pleased with the strength of the previous heroin, contacted defendant wanting more. (Docs. 15, at 8-10; 19, at 13-14). Defendant informed him that her supplier had been arrested. (Docs. 15, at 8-10; 19, at 14). A few days later, however, defendant found another supplier and sold more heroin to the purchaser. (Docs. 15, at 10-13; 19, at 15-17). This distribution nearly resulted in an overdose death—emergency personnel revived the purchaser with Narcan. (Doc. 19, at 8-10). Defendant herself had overdosed on heroin on April 1, 2020. (*Id.*, at 4-6).

Defendant is also alleged to have attempted to distribute heroin on July 8, 2021, in another controlled purchase, with the purchaser who overdosed on July 7, 2021, serving as the confidential informant. (*Id.*, at 19). Again, defendant is alleged to have used a communication facility in attempting this distribution. (*Id.*). Defendant attempted to get heroin from her supplier, but her supplier "fell out" and was not waking up, which defendant attributed to her supplier using the heroin he sold. (Docs. 15, at 14-15; 19, at 20). When the confidential informant, per officers' instructions, asked defendant if her supplier needed Narcan, defendant responded "LOL no doubt." (Docs. 15, at 16; 19, at

---

are not inconsistent with the indictment. At the hearing, the government presented evidence that heroin causing overdose is generally suspected to contain fentanyl and in this case testing of the victim purchaser's blood showed the heroin sold by defendant on July 7, 2021, contained fentanyl. (Doc. 19, at 18-19).

20). Defendant stated she planned to leave if her supplier did not "wake up pretty soon." (Doc. 15, at 16). When the confidential informant asked where defendant was, defendant responded that she already had a ride with someone else and was going to go deliver some methamphetamine. (Docs. 15, at 16; 19, at 20-21).

The alleged offense conduct is very serious. The evidence supports that defendant, a drug user who herself had overdosed on heroin, distributed methamphetamine and fentanyl, and would have distributed heroin had she been able to get some. Defendant is routing these poison substances into the community; this is serious in and of itself. But defendant's attitude toward the inherent danger in using controlled substances makes the distribution more serious. Defendant appears to have acted with no remorse that these drugs—particularly heroin and fentanyl—were causing overdoses that could result in death. Indeed, defendant appears to have been concerned only with the fact that the tragedies of others might infringe upon her ability to sell more drugs and use more drugs. To be blunt, it seems defendant did not care whether her fellow users lived or died. Defendant is correct that Judge Roberts did not mention the fact that defendant's supplier's girlfriend was also present during his overdose. But that fact does not affect this Court's analysis because, in defendant's own telling, the girlfriend could not get defendant's supplier to wake up—thus, she could not help him. As to defendant's assertion that it was unclear whether the supplier needed Narcan, the Court relies on defendant's own words: again, when asked whether her supplier needed Narcan, she responded "Lol no doubt."

Thus, the nature and circumstances of the offense weighs in favor of detention.

### 2. *Evidence of the Offense*

The evidence of the alleged offense weighs in favor of detention. *See* 18 U.S.C. § 3142(g)(2).

The evidence supports that defendant distributed methamphetamine and fentanyl, and attempted to distribute heroin. (Docs. 15, 19, at 6-21). The evidence also supports

8

that defendant used Facebook Messenger in her distribution of fentanyl and attempted distribution of heroin. (Docs. 15, 19, at 6-21). The government's variety of corroborating evidence, including officer testimony, Facebook Messenger records, and defendant's statements to officers, further strengthens the evidence against defendant.

Thus, the evidence of the offense weighs in favor of detention.

### 3. Defendant's History and Characteristics

Viewed collectively, defendant's history and characteristics weigh in favor of detention. *See* 18 U.S.C. § 3142(g)(3).

Defendant is 43 years old and has lived in Iowa her entire life. (Doc. 14, at 1-2). Due to her mental health diagnoses, defendant has received social security disability income since 2010 and has not maintained employment since then. (*Id.*, at 2).

Undoubtedly, defendant has a history of substance abuse. (*Id.*, at 4). Notably, she disclosed to the probation office that she last used methamphetamine in March 2023, last used marijuana in 2022, and last used heroin in 2020. (*Id.*). Defendant also advised that she has been prescribed methadone through the Galena Clinic in Galena, Illinois, and that she takes methadone daily and finds this treatment helpful. (*Id.*). Defendant's attendance at the Galena Clinic was verified. (*Id.*, at 5). The government, however, presented evidence that defendant has attempted to sell her doses of methadone. (Doc. 15-2).

Though defendant's answers are straightforward, the reality of defendant's recent drug use is a bit more complicated. Defendant's partner, Adam O'Neill, confirmed defendant's history of heroin use and methamphetamine use, which O'Neill stated continued until defendant's arrest here. (Doc. 14, at 5). Again, defendant was arrested on April 11, 2023. (Doc. 7). Accordingly, when defendant last used methamphetamine is somewhat in dispute, though the Court is not too concerned with this relatively small discrepancy. Questions exist about defendant's recent use of other drugs, too. For instance, on July 7, 2021, defendant stated that she could not "give up [her] other drugs"

9

and that she kept failing her urine analysis tests "for meth, crack n benzos." (Doc. 15-2, at 5). But defendant told the probation office that she had not used cocaine of any kind since she was 16 years old and had not used pills since she was 30 years old. (Doc. 14, at 4). Defendant's contradictory statements give the Court pause that she is being honest about her drug use, and her attempt to sell her methadone gives the Court reason to believe that she does not take her substance abuse treatment seriously. Thus, defendant's controlled substance use, and her suspect credibility about her drug use, weighs in favor of detention.

Defendant's criminal history is limited. Her non-substance abuse convictions include possession of alcohol, interference with official acts, and two thefts in the fifth degree. (*Id.*, at 5-7). Defendant also has one conviction for unlawful possession of a prescription drug and two convictions for possession of a controlled substance, methamphetamine. (*Id.*).

Defendant's performance on court supervision is more concerning. Defendant has two controlled substance violations while on probation. (*Id.*, at 6). The alleged offenses here also occurred while defendant was on probation. (*Id.*, at 7 (noting probation beginning on April 8, 2020, and discharged on January 7, 2023)). The government's evidence also supports that defendant has attempted to evade detection of her drug use via urine analysis for her probation by getting "clean" urine from other people. (Doc. 15-1, at 5). At one point, defendant informed a friend that defendant no longer needed the friend's urine because defendant's mother, Linda Shaw, was going to get urine from another friend's child for defendant's use. (*Id.*). Defendant also aided others in showing them how to evade detection of drug use via urine analysis. (*Id.*, at 1). That defendant would be subject to revocation of pretrial release if her urine tested positive for controlled substances does not persuade the Court that release is appropriate here. Defendant has flouted the conditions of her court supervision and led others to do the same; the Court

cannot trust that she will act any differently now. Thus, on the whole, defendant's criminal history weighs in favor of detention.

Through the pretrial services report, defendant proposes two release plans: one with O'Neill and one with Shaw. The Court finds that defendant's release to Shaw would not be appropriate. Shaw's answers to the probation office's questions do not align with defendant's answers. (*See, e.g.*, Doc. 14, at 2, 5 (providing significantly contradictory answers regarding defendant's drug use, residence, and social security disability income)). Of more concern, again, defendant stated that Shaw attempted to get defendant clean urine from a child for defendant's urine analysis. (Doc. 15-1, at 5). If the Court were to release defendant, it would be to reside with O'Neill or another arrangement.[4]

Viewing defendant's history and characteristics collectively, the Court finds this factor weighs in favor of detention.

### 4. Nature and Seriousness of the Danger

The nature and seriousness of the danger defendant poses to any person or the community weighs in favor of detention. *See* 18 U.S.C. § 3142(g)(4).

As discussed, the alleged offenses include the distribution of methamphetamine and fentanyl, and attempted distribution of heroin. Accordingly, the danger that defendant poses to the community is the danger she poses by selling these controlled substances that are highly addictive and harmful to their users. Again, though it is not alleged that defendant sold large quantities of drugs, that defendant dealt in relatively small amounts is not substantially mitigating here because defendant was aware that substances she dealt were very strong, such that a small amount could be harmful and even lethal. Accordingly, defendant's argument that the alleged offenses do not involve

---

[4] O'Neill stated he was unsure whether defendant could return to live with him. (Doc. 14, at 2). O'Neill has two dated criminal convictions and in 2020, O'Neill filed two petitions for relief from domestic abuse against defendant, which were dismissed. (*Id.*). Thus, the Court takes this statement to mean O'Neill was not sure that defendant would be allowed to return to live with him, not that O'Neill was not sure whether he would want defendant to live with him.

violence or firearms is ultimately one of form over substance. Though use of controlled substances does not always result in injury or death, defendant knew—from her own experience and the repeated experiences of others—that people overdosed from heroin, including the very heroin she aimed to sell. Her reaction was not to stop or pause her sales, or to warn purchasers; instead, it was to complain that people who overdosed were "pathetic" and "stupid." This callousness, which Judge Roberts referred to as a "cynical approach to the drug trade," (Doc. 19, at 41), supports that defendant poses more than the typical danger posed by a low-level drug dealer because she is willing to distribute drugs that she knows regularly cause overdoses without remorse. This attitude poses an even greater danger because defendant asserted she is "mutual with every dealer in this town so I can go to anyone in want n [sic] always get it." (Doc. 15-2, at 1).

The Court acknowledges that much of the government's evidence in support of defendant's distribution and attitude is dated. The most recent Facebook Messenger records submitted are from July 7, 2021. (Docs. 15, 15-1, 15-2). The latest alleged offense conduct charged in the indictment occurred on July 8, 2021—nearly two years ago. (Doc. 3). But the government also showed evidence that when defendant was arrested on her warrant in this case, she had methamphetamine, marijuana, and a new bag of unused syringes on her person. (Doc. 19, at 26). Defendant also stated that she intended to "share the methamphetamine with another person." (*Id.*, at 27). In short, there is no evidence that she has reformed her ways since 2021.

Thus, the nature and seriousness of the danger posed by defendant weighs in favor of detention.

### 5.    *Presumption*

Although the Court found defendant rebutted the presumption of detention, the Court must weigh the existence of the presumption along with the Section 3142(g) factors. *Abad*, 350 F.3d at 797. Again, the presumption exists because defendant's charge is based on narcotics trafficking, resulting in substantial potential penalties. These

penalties reflect the serious nature of the alleged offense and the direct harm it inflicts upon the community. Thus, the Court finds the existence of the presumption weighs in favor of detention. Again, the Court does not give this factor substantial weight; to do so would, in effect, negate the significance of overcoming the presumption.

In sum, the Court finds each of the Section 3142(g) factors weigh in favor of detention. The Court finds the government has met its burden to prove by clear and convincing evidence that no condition or set of conditions could reasonably assure the safety of the community based on the danger defendant poses.

## V.      CONCLUSION

For these reasons, the Court agrees with Judge Roberts and finds the government met its burden as to the danger posed by defendant. In light of the foregoing, defendant's Motion for Revocation of Order of Detention (Doc. 20) is **denied**. Defendant will remain detained pending trial.

**IT IS SO ORDERED** this 12th day of May, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

13